The next case we are going to hear is Vickery v. Thomas, no that is Mr. Vickery. It is Vickery v. Thomas, I think the parties are Higgins v. Forest Labs. May it please the court. My name is Andy Vickery, I am a lawyer from Houston, Texas along with my brother Lanny who is at the council table with me. We represent Kathleen Higgins who lost her husband to a suicide that we have alleged was triggered by the drug Lexapro. On March 22, 2004, the FDA issued a public health advisory that Mr. Thomas asked the court below to take judicial notice of a drug that changed what had theretofore been an academic debate and a legal controversy into a regulatory requirement. The FDA for the first time in the 15 years since the Prozac wonder drug class of drugs, the SSRIs have been on the market, for the first time it acknowledged that for a small vulnerable subpopulation of patients, these drugs which were designed to treat depression could paradoxically cause some people to take their own lives or to harm others. Dr. David Healy, whose testimony is at issue in the Daubert cross appeal, had been saying that for years in peer reviewed literature and quite frankly I had been saying it on behalf of other SSRI widows in courts across this country for over a decade. But it changed things dramatically. And it said that first of all these drugs can trigger suicidal behavior in some people. Second, that the danger period was the early period when the patients first started or when their dose was changed. It told the drug company that whatever knowledge the physicians have now is not enough. You need to change the labeling and tell the doctors they need to factor that into their own prescribing decisions. It also told them, significant to this case, that they needed to be an effective conduit of that information to the patient and to the patient's family. And both Dr. Andres and Dr. Doyle said if they had been told that, they would have told Kathleen, who testified that if I had had any inkling this drug could cause my husband to become suicidal, I would have made sure he never took it. And the FDA advisory alerted physicians and their families and caregivers to precursor conditions that would lead to the suicidal behavior, which is very important in a case like this, because Francis Krivosich, when he saw Dr. Doyle in mid-July, was exhibiting classic signs of akathisia, which is a drug-conduced decision. It comes from a Greek word that means literally can't sit still. And when he saw Dr. Doyle in mid-July, Dr. Doyle reflects he can't even sit still. 17 days after Francis Krivosich, who was a Harvard-educated architect and sculptor, began taking Lexapro, and a few days after his dose was doubled, he took his life with a single gunshot wound. Now, interestingly, we are here on an appeal of a summary judgment granted on the basis of an affirmative defense. It was pled as an affirmative defense, the learned intermediary doctrine. So the scope of review of this court is not only de novo, but the court must be satisfied that the defendant carried their burden to conclusively prove each element of their pled affirmative defense of the learned intermediary doctrine, which is a problem, because no court in the Commonwealth of Virginia, no state court, has ever said that it even recognizes the learned intermediary defense. Now, if it did, we know the circuit has been wrong about four or five times, six times, every time they've stated it, they're just in error. Well, the Supreme Court of West Virginia, I'm asking you about the Fourth Circuit. I know, but the Fourth Circuit, if you said two times, you're talking Virginia cases. But if you include six or seven, you include this court's prediction that West Virginia would adopt. West Virginia is far different than Virginia. And it wasn't a prediction. It was a holding as to what the law was in Virginia in those cases. And the question is, were we in error? The answer is that I think this court's eerie obligation is not to decide whether the tally opinion, which was in 1999, was a correct prediction of the state law at that time. Because if you said they've adopted it, yes, you were in error. If you predicted they would adopt it, then... We didn't predict. We held several times, beginning with Judge Irvin's decision. We held that Virginia recognized it, relying on the Pfizer case. And we have held that consistently in published and unpublished opinions. The question is, were we in error in making those holdings? Yes, you were. And now how do we correct that? The only way we can correct that is an en banc, right? Not really. Because... And I've thought a lot about this, Your Honor. Because the court's obligation in an eerie context is to determine what it believes the highest court of the state of Virginia would do today. So that the tally decision, which is 1999, which is the most on-point holding of this court, is, as cited Judge Browning's opinion in our reply brief from the Anderson case out in New Mexico, he points out that sometimes the precedence of federal courts wither over time when they make eerie predictions of what state law should be. So I don't think it needs to go en banc. You keep going to prediction, but I think, and I don't want to take a look, but I think we held that that was the Virginia law. Yes, sir. I believe you're correct. I believe some of the language says holding. And you asked me, was that wrong? If it's a prediction, it's not wrong. If it's a holding, it is wrong. Because Pfizer clearly did not adopt the learned in an eerie doctrine. But it's a precedential holding for this court. So going back to Judge Niemeyer's point, how could we undo that? How can you undo it? Other than an en banc hearing. Well, there are three ways, okay? One way is certification, which I urge, I implore the court to do with a separate motion that the court's denied. I don't know if it was this panel or a different panel. Why certify? We interpreted Pfizer. This is Judge Irvin in 1981. The well-settled rule is that the duty and ethical drug manufacturer owes to the consumer is to warn only physicians or other medical personnel permitted by state law to prescribe drugs of the risks or contraindications associated with that drug. That was the Stanwick case. Standback case. That's the first case. That's 94, I believe. Is that right? 81. 81, okay. And Pfizer, it was interpreting Pfizer. Pfizer was 80. And then in 99 in Talley, we said the same thing. I think we've done several unpublished opinions following the same thing. Right. But if I may respond to Judge Thacker's question, it doesn't require an en banc because the court's eerie obligation is to always, at every point in time, ascertain what it believes the law would be as determined by the court. You're missing the point. You're changing the standard. You're absolutely correct when there isn't a law. But when there is state law in place and we construe it and we construe it and say, this is what the Virginia law is, we can't change that with a panel hearing when the court has said a couple of times, maybe more than a couple of times, what the law is. It's not what they would do. Your Honor, I think my problem is that there is no Virginia state court opinion, including Pfizer, that even uses the phrase learned in a meteor. No, that's just a description of the doctrine. They announced the doctrine in Pfizer. No, they didn't announce it. They represented it was a common law thing. And Judge Irvin said it was a well-settled rule in Virginia. So it's not what they would do. It's settled. That's what we held. Now, if he was wrong, the way to correct that is to wipe that opinion out. It certainly wouldn't bother me if the court took that issue on. It's worthy of being held. Whether we as a panel can overrule our prior opinions which describe what the Virginia law is. I believe you can because I believe, although my because the case that Judge Browning said that the courts can recognize, even this court can recognize, that the precedential value of our panel opinions, quote, wither over time in the eerie diversity context. And I believe that this panel could say we have to give a fresh look at this because the federal court's eerie obligation is always to apply the substantive law as the highest court of the state would apply it. And if we're not going to ask them, then we have to predict what they would do in 2015. It's established law. They haven't overruled Pfizer. But Pfizer didn't establish it, Your Honor. That's my point. It did. I beg to differ. It did. And if it didn't, we so help. You did so whole, but it didn't do it. I mean, all that Pfizer did, if you look at the procedural Pfizer said, it is an elementary principle of law, elementary principle of law, that in the case of prescription drugs, it is the general rule that the duty of the drug manufacturer is to warn the physician who prescribes the drug in question. I understand. And that's what we construed to say that this means that's an exception to the normal rule, which Virginia had is to warn the consumer. Right. And Your Honor is correctly quoting Pfizer. The problem is you're quoting dicta from Pfizer. If you look at the procedural context of Pfizer, the issue before the Virginia Supreme Court in Pfizer was the adequacy of a warning to the physician. That was the issue. So the holding concerns evidentiary adequacy. That statement is dicta in the Pfizer opinion. And admittedly, this court has on several occasions said, well, that's the law. Virginia has adopted the learned intermediary doctrine. I believe the panel can make a prediction fresh in 2015. But given the time, I'd like to move to the other point, which is we win on summary judgment in any event. Because if the affirmative if the learned intermediary doctrine is an affirmative defense, then it's pretty clear there are two elements of it that they have the burden of pleading and proving and they did neither. The first element is that they warned someone, that they took reasonable measures to give an effective warning to the physician. They did not do that. They did not do that here. And the second one is that the prescribing physician. The physician said they were aware of it. Well, that was where I was going to get to, Your Honor. The second one is, and the cases were all collected in the First Circuit's Garside opinion. They looked collectively across the country at all the cases where summary judgment had been upheld on the basis of the testimony of a prescribing physician. They said the common denominator is there has to be unequivocal testimony and that unequivocal testimony from the prescriber shows that they knew all of the information. It's abundantly clear that Dr. Doyle's testimony and Dr. Andrew's testimony is equivocal. It's abundantly clear that neither knew what the FDA advisory said that it was important for them to have told the family. I'm not sure you're being fair, Director. I'm not sure this family business, they can even do that with HIPAA. I'm not sure you can go to a daughter-in-law who has to be taking care of the mother as entitled to notice of anything, it seems to me. That's a legitimate issue. The warning is to let the patient know, and in this case, the doctors did go over this with the doctor, with the decedent. Not this risk. Neither of these doctors had any clue that this drug could cause this man to take his life. We're not reading the same record. I read the testimony of both these doctors, and they acknowledged, they said it was common knowledge. Everybody knew this. Your Honor, with respect, they said they were aware of a controversy. Four months ago, a different panel of this court reversed the product's liability summary judgment of the same district judge, the Hodges case, it's number 141333, for doing exactly what was done here, and that is to ignore the inferences in favor of the plaintiff and to basically put the burden on the wrong people. They have the burden if this is an affirmative defense, and the burden is to prove that they gave a warning, which they did not do. One of the questions of Dr. Doyle is, did either the literature or any sales representative or dear doctor letter from Forrest ever convey the message to you that the use of this medication can cause suicidality or worsening suicidality? Answer, yes. Right. It's a very broad question, but the testimony... And it's a very clear answer. Well, it is. It is, but Dr. Andrus is the one that prescribed it, and the record also contains the testimony of the sales rep who called on him in mid-June after the FDA said you need to tell doctors that they need to warn people and who thought the worst side effect of this drug was dry mouth and had been instructed by the company not to initiate discussions about side effects. So I submit with respect that the... Dr. Andrus said he still would have prescribed Lectapro to this patient even if, regardless of... He did, he did, Your Honor, but he said he would have acted in a different way in terms of alerting the patient and responding to the patient. So it's not just would the doctor prescribe it or not. Did they warn them? They've got no proof that they did. And were these physicians aware of all of the information in the public health advisory? They were not. We've given you the record of those sites in that last section of our brief to the testimony of both of them that shows they didn't know everything that the FDA said. And that's why I began with the opening statement that I did, because sure, there had been controversy academically, controversy in the courts, but this is the first time that the FDA had said this drug could be a problem and something more needs to be done to protect people. This is the first time that that happened. Stoll said he advised his clients, all his patients, about that. About the drug causing it? Not causing it, the concern that it could cause it. There still was a debate as to whether there was actual causation at that point. There was. Did you advise your patients that they should be watchful for a worsening of their symptoms or the emergence of suicidal thinking? The answer. I routinely told patients then as now that a worsening of the depressive symptoms, including suicide impulses, could occur. And those should be reported to me immediately. Right. And what is missing from that is because of the drug. You see the warnings before this point in time. That's what they're talking about. They're talking about the whole Lexapro. Your Honor, the warnings for these drugs before March of 2004 said suicide is an inherent risk of depression and you need to watch your patients because they might become suicidal from depression. So Dr. Doyle's testimony about that. Doyle says he said I weighed the suicidal tendency from depression with the suicidal tendency from the drug. And I would still go with Lexapro because it was a greater suicide risk with the depression. I do not believe he said I weighed it from the drug. I do not believe that either of these men had an awareness and testified unequivocally. We're quoting to you things that you say don't exist in the record and you're just overstating the record, I'm sad to say. I mean, we'll go back and look at it, but I don't think you can make the categorical statements you're making from this record. Well, Your Honor, I try to be very careful about that. And I submit the testimony of both of these men is as equivocal as the testimony of Mr. Hodges and the other case that I referenced. That they did not know all of the things that the FDA advisory would tell them. And we've briefed extensively on Featherall and 388 and those circumstances under comment and when an intermediary can even be used. Of course, that's incompatible. But it may well be that that particular issue would have to go on back if this Court decides so. But certainly to reverse the summary judgment, this panel could do it. Is there any indication from the Virginia legislature or the Virginia Supreme Court that Pfizer is in good law? As of today? No, sir. Is there any hesitation by a Supreme Court opinion saying we're not going to follow Pfizer? Or we disagree with the Fourth Circuit in its interpretation? There is not, but neither is there any indication that says we agree with the Fourth Circuit. Neither the legislature nor the Supreme Court have ever even addressed the issue. That's why I asked for certification in the first place. Neither of them have addressed it. So we can say, well, do they disagree with Pfizer? No. Do they agree with Pfizer? No. Aren't the trial courts applying it regularly in Virginia? Some are, some aren't. I've gone way into my time, I see. All right. We'll hear from you on the rebuttal. Thank you. Good morning. May it please the Court? Joe Thomas on behalf of the Pfizer entities. First, to just clarify, I think a misunderstanding about the public health advisory in 2004, it didn't include any warning whatsoever that a small vulnerable subpopulation of adults could kill themselves. That simply was not part of it. In fact, the warning today for people of Mr. Krivosevich's age must say that there is no evidence that it causes people to commit suicide. It's a very unusual package insert, but the record is clear that that's the warning that's required. There's no increased risk over age 24, and at age 65 and above it's protective. That's not even for suicide. That's for a term called suicidality, which is suicidal thinking and behavior. In other words, the concern about suicidality, suicidal thinking and behavior, is and was only for people up to age 24. And even in that population of people... Did the March advice address the population over age 24? Yes, simply to say that the evidence wasn't there. That it hadn't been established one way or another whether it could be the drug or the warning. After that time, they continued to do an analysis, and the record's pretty clear that they did a very extensive analysis. 372 studies, 100,000 patients is what's in the record that the FDA reviewed, and then they came to the conclusion that there wasn't evidence of an increase in suicidality over the age of 24. That there was not. No evidence of an increased risk. And so the warning never did relate directly to the drug. The warning that came out with the public health advisory was, obviously there was a concern about pediatrics, that's what they were working on at the time, but it really had to do with monitoring these patients. You have to monitor your patients closely. And you have to monitor them for emergence of suicidality. And it mentions at the beginning of treatment, because that's when people are most suicidal, but it says right there that we can't tell you whether it's related to the drug or not related to the drug. And ultimately they concluded that there wasn't evidence. So today, we are required to say that there isn't evidence for greater than 24 and over 65 protective against suicidality. I don't want to really spend much time on the cases with regard to the learning and intermediaries in Virginia, multiple cases from the fourth circuit that make it pretty clear about the learning and intermediary doctrine. With regard to those learning intermediaries, it is certainly the case. They actually had a greater understanding of a risk than what the FDA ultimately concluded. What they testified to was very clearly that they believed that the drug could cause some people to be suicidal. And yet, that's ultimately not what the FDA concluded if you went all the way to 2006 and the FDA's final analysis. So they also knew about the monitoring. And in fact, the physician explained that he wanted to share the information with third parties to tell them to be careful. The friend who took Mr. Krivosich to see Dr. Doyle. And he said, I just couldn't do it because of privacy concerns. That public health advisory was shared, but so was this warning. This warning was repeatedly given to the physician. The record is very clear on this. On multiple occasions, sample packages with package inserts that between May 31 and July 25, which was the date of his death, over the 55 day period of time, they were repeatedly given this warning. And that is undisputed in the record that they repeatedly received samples and package inserts that contained the public health advisory. So they had exactly the warning that plaintiff's experts said would have been an adequate warning. So that's the issue on the learned intermediary. With regard to a couple of other issues, I do believe that any claim that the warning was inadequate is preempted. There is a First Circuit case that involves this company and this drug. And I think it's directly applicable here. Because the warning had just changed. It just changed in January of 2004, January of 2004, and May of 2004. The law is, pursuant to Wyeth v. Levine, that there has to be newly acquired safety information between the label change and the event. And there isn't any evidence of newly acquired safety information directly consistent with the First Circuit's holding in the NRA, Celexa, and Lexapro case. So for that reason, I do believe it's preempted. Briefly, a comment with regard to the experts. Dr. Healy's experts report in this case was actually fraudulent. We've tried to lay it out. It's complicated, but we laid it out in our brief. He claimed to have... How do you even have an appeal on the experts at this point? If you're right and you went on summary judgment, then it's moot. Correct. If you're wrong, isn't it premature if we send it back? Well, it became final. The order from the court became final at the time of the ruling of this judge. So we feel like we have to appeal the issue or we will have lost the opportunity to appeal it. Actually, it's an important issue to us because this is a psychiatrist who comes out of Wales. He's actually very dangerous to society. I mean, this person, his report is fraudulent. He claimed to have gotten all the FDA's data on the users of this drug. It's very clear in his testimony he admitted because we found out where he actually got it that he didn't get it there at all. Secondly, the data that he used is not what he represents it to be. He claimed to have reported in his report all of the cases of people on the drug and how many people were suicidal. And he actually used a different table. Why did he do it? He simply thought the numbers would be better for him. That's what his testimony says. So that's a concern. I mentioned these 372 studies. Moving to Dr. Hamerl, 372 studies in 100,000 patients. Dr. Hamerl didn't look at any of that. He counted adverse event reports on file with the FDA. Of course, a lot of those are from lawyers who file lawsuits because those become adverse event reports. But Dr. Hamerl just counted them up and said, boy, there's enough there that you should have a different warning than the warning you have. And that's just wrong. He didn't even know the FDA had done the analysis. He didn't know what the FDA's results were. The FDA did this analysis over and over and over and over a period of years. And he completely and totally ignored the data that were there. Thank you. Mr. Vickery? If it were the law today that Virginia patients who receive prescriptions for Lexapro are not entitled to receive a warning, that law would be preempted. Why? Because in 2007, three years after this man was dead, the FDA required not only a black box warning for patients of all ages, but also a patient medication guide to be given to the patient to alert them to that risk. So even if the Virginia law today were, oh, patients have no legal right to get a warning, that law would be preempted. That law would be preempted. That's the situation today. The preemption analysis is thoroughly brief. I don't have time to discuss it, but we've handled 28 cases in the wake of Wyeth v. Levine. SSRI cases, the only court that's held it as preempted was Dobbs. And that case was settled after the argument in the Tenth Circuit, so we couldn't get an appellate ruling on it. The Daubert issues are thoroughly hashed out. Judge Sippel, the MDL judge, considered all of the arguments that Mr. Thomas is making. They weren't quite as ad hominem as they are this morning, but he considered them all. And the judge said, Daubert itself teaches that vigorous cross-examination is the way to handle what you perceive to be problems. Dr. Healy has written peer-reviewed articles for years and years and published a book on the anti-depressant era by the Harvard Press. So to say, oh, this is some dangerous guy from Wales who's fraudulent. Well, if so, he's managed to fool the Harvard Press and the editors of peer-reviewed journals all over the world. If you lose, that ends the case. If you win, it's just going to be a remand. They haven't been tried yet. The Daubert issue is really a pre-trial ruling of what's going to happen at trial. They're going to renew their motion. I don't think they can, Your Honor. The appeal that they're making now is on the general causation opinion of Dr. Healy that was made by the MDL judge before it was transferred back to Virginia. So it applied to all the cases in the MDL. Now, it is their practice to challenge Dr. Healy in his specific causation opinions. They did that earlier this year in the Illich case. Mr. Thomas and I were in Seattle. Dr. Healy was there, was on the stand, examined by the court. But you just told me, though, that the MDL judge agreed that the way to challenge these doctors was in cross-examination at trial. He did. And it seems to me when that person takes the stand and all the credentials are actually presented and the basis for the opinions is presented, it seems to me the trial judge can make the Daubert ruling at that point. He could conceivably do that, but to ask a trial judge to basically undo a ruling that was on general causation that was made by the MDL judge when it was in the MDL. You're missing my point. The trial hasn't happened. There's no evidence. You can't make a ruling that's binding on a trial until you see what happens at trial. It's fine with me. They could say something totally different at trial. That's certainly true. That is certainly Has Dr. Healy ever been excluded? He was excluded one time in the Miller case that involved a 13-year-old boy who hanged himself in his closet. It was my case in Kansas City. The Tenth Circuit affirmed it. That same year he testified in the Tobin case in Wyoming, which was my case, and the jury found for the plaintiff. And that case got resolved. There was never a Tenth Circuit decision on that. The reason that the MDL judge said Dr. Healy was vindicated by the subsequent FDA actions is that one exclusion in the Miller case involved a 13-year-old boy. And when the FDA in September of 2004 said causality is established with regard to the teenagers, that vindicated Dr. Healy's position. I'm out of time. If the court has any other questions, I'm here to answer them. All right. Thank you, Mr. Vickery. We'll come down and greet counsel. Actually, there's a cross-appeal. He has some rebuttal. Just very briefly, I wanted to explain that the opinion from the MDL is the general causation opinion of Dr. Healy. It's not his specific causation opinion. For example, the discussion of a case in Seattle, that related to his specific causation opinion in that case. He has, Dr. Healy, a specific causation opinion in this case as well. The challenge is to his general causation opinion out of the MDL. It's an opinion that is applicable to all of the cases, which is the reason we challenged those rulings, because it has to do with whether the drug can cause people to commit suicide. So the circumstances are unique. In fact, there are four cases in this circuit involving Dr. Healy and his general causation opinion. We have a case that's actually on appeal in the fourth circuit, another case that involves Dr. Healy and his general causation opinion, in which he's not even the specific causation expert. So, just for clarity on that. All right. Thank you. All right. We'll now come down and greet counsel and then proceed on to our last case.
judges: Paul V. Niemeyer, Roger L. Gregory, Stephanie D. Thacker